UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| ERIC STEPHEN LEVITT, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 2:12-cv-00032-JAW |
| | ) | |
| SONARDYNE, INC., | ) | |
| | ) | |
| and | ) | |
| | ) | |
| SONARDYNE INTERNATIONAL, | ) | |
| LTD., | ) | |
| | ) | |
| Defendants. | ) | |

## ORDER ON MOTION TO DISMISS AND MOTION FOR LEAVE TO AMEND

In this Maine Whistleblowers' Protection Act and Maine Human Rights Act claim, the Plaintiff claims he was fired for blowing the whistle on his employer's sales of diver detection equipment to China—sales the Plaintiff thought were illegal and unsafe. The Defendants move to dismiss the Plaintiff's Complaint for failure to state a claim upon which relief can be granted. The Plaintiff moves for leave to amend his complaint to cure the deficiencies asserted by the Defendants. The Court concludes that the Plaintiff's proposed amended complaint states a claim upon which relief can be granted and grants him leave to amend.

## I. STATEMENT OF FACTS

### A. Procedural History

On November 21, 2011, Eric Stephen Levitt filed a complaint in Maine Superior Court, Knox County, against Sonardyne, Inc. (Sonardyne), and Sonardyne

International, Ltd. (Sonardyne International).  *Compl.* (ECF No. 2-2).  Sonardyne

filed a notice of removal in this Court on January 27, 2012.  *Notice of Removal* (ECF

No. 1).   Sonardyne and Sonardyne International answered the Complaint on

February 6, 2012.  *Def. Sonardyne, Inc.'s Answer to Pl.'s Compl.* (ECF No. 9); *Def.

Sonardyne International, Ltd.'s Answer to Pl.'s Compl.* (ECF No. 10).   Sonardyne

International amended its answer on March 16, 2012.  *Def. Sonardyne International

Ltd.'s First Am. Answer to Pl.'s Compl.* (ECF No. 21).   On March 19, 2012, the

Defendants jointly filed a motion to dismiss pursuant to Federal Rule of Civil

Procedure 12(b)(6).  *Defs.' Mot. to Dismiss* (ECF No. 22) (*Defs.' Mot.*).   Mr. Levitt

responded on March 26, 2012.  *Pl.'s Mem. of Law in Opp'n to Defs.' Mot. to Dismiss*

(ECF No. 24) (*Pl.'s Opp'n*).  The Defendants replied on April 4, 2012.  *Defs.' Reply in

Support of Mot. to Dismiss* (ECF No. 25) (*Defs.' Reply*).

On October 23, 2012, the Court issued an Order disapproving a contingent

request for leave to amend tucked away in Mr. Levitt's opposition to the motion to

dismiss, and imposing an expedited schedule for the Plaintiff to file a proper motion

for leave to amend if he so chose.  *Order on Request for Leave to Amend* (ECF No.

30); *Am. Order on Request for Leave to Amend* (ECF No. 31) (correcting

typographical error).   Mr. Levitt moved for leave to amend his Complaint on

October 30, 2012; attached to his motion was a proposed amended complaint.  *Pl.'s

Mot. for Leave to Amend His Compl.* (ECF No. 32) (*Pl.'s Mot.*); *id. Attach. 1*, First

Am. Compl. and Demand for Jury Trial (ECF No. 32-1) (*First. Am. Compl.*).   The

Defendants responded on November 6, 2012.  *Defs.' Opp'n to Pl.'s Mot. for Leave to

*Amend His Compl.* (ECF No. 33) (*Defs.' Opp'n*).  Mr. Levitt replied on November 9,
2012.  *Pl.'s Reply Mem. in Support of His Mot. for Leave to Amend His Compl.* (ECF
No. 34) (*Pl.'s Reply*).

### B.    Eric Stephen Levitt's Allegations

In his First Amended Complaint, Mr. Levitt alleges the following facts.
Sonardyne and Sonardyne International hired Eric Stephen Levitt in April 2008 to
work as Business Development Manager for a diver detection program that both
companies were attempting to sell to the United States Navy and others.  *First Am.
Compl.* ¶ 7.  Mr. Levitt, during his employment, became aware that the Defendants
were selling diver detection technology equipment for civilian use to Chinese
companies affiliated with the People's Republic of China (China), and that the
Defendants were selling to China for military use diver detection technology
virtually identical to the diver detection technology already sold to the United
States Navy.  *Id.* ¶¶ 13, 15.  Naval vessels may be vulnerable to shaped charges
that an adversary attaches to their hulls for later explosion and diver detection
technology is vital to ward off such attachments.  *Id.* ¶ 14.  If a military rival of the
United States has the same diver detection technology as the United States, that
rival can devise a means to disable or circumvent that sensitive technology.  *Id.*

Mr. Levitt complained to the Defendants that they "were engaging in illegal
conduct by selling this identical military use diver detection technology to [China]."
*Id.* ¶ 16.  He complained to them "about this sales practice which he had reasonable
cause to believe would put at risk the lives of American sailors should [another

3

country] be able to use such technology to circumvent the diver detection technology then in place on American naval vessels." *Id.* ¶ 17.

The Defendants told him that they were not engaged in an illegal or unsafe practice because they were selling a "different and less capable" technology to China; Mr. Levitt continued to complain about "what he reasonably believed to be an illegal and unsafe sales practice" without effect. *Id.* ¶¶ 18-19.  In July 2010, Mr. Levitt "became aware that the assurances he had received from Defendants that no violation of American law and no business practice potentially unsafe to American naval personnel was occurring were incorrect." *Id.* ¶ 20.  He then "raised these issues of illegality and safety with greater urgency with his direct supervisor, Rob Balloch." *Id.*

Growing frustrated, in August 2010, Mr. Levitt reported what he believed to be unsafe and illegal conduct to "individuals who were cooperating with the United States Naval Criminal Investigation Service (NCIS)." *Id.* ¶ 21.  He had learned that NCIS was interviewing people close to the diver detection program for possible illegal dealings by the Defendants, specifically with respect to China. *Id.* ¶ 22.  He also learned that the U.S. government was investigating whether federal funds given to Sonardyne to develop the diver detection technology for the U.S. Navy were being illegally used to develop the system sold to the Chinese. *Id.*  Mr. Levitt further discovered during his employment that the Defendants "had illegally misrepresented to both the United Kingdom and the United States the capabilities and alleged civilian only use of the diver detection system it was selling to [China]

so as to obtain an improper characterization that the diver detection system was not export controlled." *Id.* ¶ 23.  He became aware that the sales to China were being investigated by the United Kingdom Ministry of Defence and by NCIS as "constituting a potential violation of international law enforceable in both jurisdictions." *Id.* ¶ 24.  He became aware that the Defendants had represented to the Ministry of Defence and NCIS that the equipment sold to China was for commercial use only, when in fact it was being sold for military use. *Id.* ¶ 25.

Also in August 2010, Mr. Levitt was informed by his contact with the United States Navy, Jim Pollock, that if the Defendants were selling the identical diver detection system to the Chinese military, this sales practice would be both illegal and unsafe to American naval personnel.  *Id.* ¶ 26.  Mr. Pollock asked Mr. Levitt to obtain assurances from the Defendants that they were indeed selling for commercial use only a less capable system to China.  *Id.* ¶ 27.  Mr. Pollock, on or about September 18, 2010, asked Mr. Levitt to provide the United States Navy and NCIS an outline of the differences between the diver detection systems sold to China and to the United States Navy.  *Id.* ¶ 28.  Mr. Levitt sought the requested information directly from management of the Defendants, who responded by refusing to produce complete and clear delineations of the differences between the two systems.  *Id.* ¶ 29.

Mr. Levitt's belief that the sales practices of the Defendants were unsafe was based on his knowledge that, were any rival military to know the precise parameters of the diver detection system protecting American naval vessels, that

rival military might devise a means to disable or circumvent that technology and thereafter mold shaped charges to the hulls of U.S. naval vessels to later sink the vessels, endangering naval personnel on board. *Id.* ¶ 30. His belief that the sales were illegal and a violation of export laws, Wassenaar Arrangement, and military procurement laws in the United States was based on his knowledge that the sales were being investigated by NCIS and by the Ministry of Defence on these grounds, and on representations made to him by Mr. Pollock. *Id.* ¶¶ 31-32.

The Defendants became aware, through their employee John Ramsden, that Mr. Levitt had received a field report from a Sonardyne engineer describing the capabilities of the system sold to the Chinese military, and Mr. Ramsden likely knew that Mr. Levitt was about to share this report with Mr. Pollock and NCIS. *Id.* ¶ 35. The Defendants fired Mr. Levitt on October 15, 2010; Mr. Ramsden and Mr. Balloch, of Sonardyne International, delivered the news.

Mr. Levitt claims he was fired in retaliation for his complaints, and argues that his firing violated the Maine Whistleblowers' Protection Act (MWPA) and the Maine Human Rights Act (MHRA). *Id.* ¶¶ 36-37. He seeks compensatory and punitive damages, alleging that the Defendants acted in reckless disregard of his rights under the MWPA and MHRA. *Id.* ¶¶ 38-39.

## II.   THE PARTIES' POSITIONS

### A.   The Defendants' Motion

In their motion to dismiss Mr. Levitt's initial Complaint, the Defendants contend that Mr. Levitt has not alleged any facts showing that he had reasonable

cause to believe that Sonardyne's sales of diver detection technology to Chinese companies were unlawful. *Defs.' Mot.* at 1. According to the Defendants, Mr. Levitt's allegations therefore show that his claim is "at best, merely possible, not plausible," as it must be to get past the pleading stage. *Id.* at 1-2, 4.

The Defendants maintain that Mr. Levitt must prove that his belief that the complained-about sales were illegal was objectively reasonable. *Id.* at 4-5. Though the Defendants acknowledge that Mr. Levitt need not prove that the sales were in fact illegal, they contend that "a belief that is contrary to established law is, as a matter of law, not reasonable." *Id.* at 5. The Defendants discuss the caselaw, and argue that Mr. Levitt must either point to a particular law he thought had been violated or establish that the complained-about sales were "unjust on their face"; according to the Defendants, Mr. Levitt's Complaint does neither. *Id.* at 5-12.

The Defendants argue that, under *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), the assertion in Mr. Levitt's Complaint that he "reasonably believed" the sales were unlawful is a "conclusory allegation" not entitled to a presumption of truth unless supported by specific facts. *Id.* at 7-8. The Defendants say that "selling diver detection technology to China is not unjust on its face." *Id.* at 8. They point out that Mr. Levitt's Complaint does not identify what law allegedly was violated, and "sheds no light on the alleged illegality other than the vague statement that Plaintiff's belief was based on 'the nature of the product being sold.'" *Id.* at 8-9 (citing *Compl.* ¶ 14). The Defendants note that "[e]ven if it could be reasonably inferred from the Complaint that United

7

States export law would prohibit the sale of diver detection equipment to government affiliated Chinese entities, those laws apply only to exports made from the United States . . .," that Sonardyne International is a United Kingdom corporation, and that Mr. Levitt has not pleaded any specific facts that would bring the challenged sales under the jurisdiction of United States export law.  *Id.* at 9-11.

### B.    Eric Stephen Levitt's Opposition

In his opposition, Mr. Levitt argues that *Iqbal* does not apply and that "notice pleading" is the appropriate standard for this case.  *Pl.'s Opp'n* at 1.  He asserts that diver detection technology "is vital to any navy warding off attempts to mold shaped charges to the hulls of its vessels so as to later sink the vessel," and states that "[i]f a military rival has the same diver detection technology as the United States, that rival can devise a means to disable or circumvent that sensitive technology."  *Id.* at 2.  He contends that the fact that he was "indirectly cooperating" with the NCIS "make[s] it clear that he was not alone in thinking" that the sales were illegal.  *Id.* at 2-3.

Mr. Levitt attempts to rebut the Defendants' contention that a belief that is contrary to established law is per se unreasonable by arguing that "there is no evidence upon which the court may determine whether Plaintiff's belief that Defendants' conduct was illegal was actually correct, or whether it was contrary to long established law."  *Id.* at 3.  He distinguishes the cases discussed by the Defendants as resolving motions for summary judgment rather than motions to dismiss, and claims that "[a] motion to dismiss is not the place to argue about the

legality or illegality of the conduct of which Plaintiff complained." *Id.* at 4-5.  He asserts that he "deserves the opportunity to explain in discovery why he believed, and why a reasonable person could believe, that Defendants' conduct was illegal," and that the complaint "is not the place to provide a discourse on the technicalities of national and international law . . . ." *Id.* at 5.

### C.    The Defendants' Reply

The Defendants state that the Federal Rules of Civil Procedure, including the pleading standard in *Twombly* and *Iqbal*, apply to actions removed from state court. *Id.* at 1-2.  The Defendants reassert that Mr. Levitt's Complaint falls short under that standard regarding whether Mr. Levitt's belief that the Defendants were violating United States or Maine law was reasonable.  *Id.* at 2-3.  The Defendants state that the Court should not consider additional facts concerning diver detection equipment discussed in Mr. Levitt's opposition motion not included in his Complaint.  *Id.* at 3-4.  The Defendants maintain that, even if these assertions were included, they would not make Mr. Levitt's claim plausible.  *Id.* at 4.   The Defendants contend that Mr. Levitt's alleged interactions with the NCIS do not support an inference that his belief that the Defendants were violating the law was reasonable.  *Id.* at 4-5.  The Defendants note that "one objective of the United States Supreme Court in *Twombly* and *Iqbal* was to weed out meritless lawsuits before the needless expenditure of resources in discovery and motion practice . . . ." *Id.* at 5.

### D.    Eric Stephen Levitt's Motion for Leave to Amend

Mr. Levitt moves to amend pursuant to Federal Rule of Civil Procedure 15(a)(2), and contends that his proposed amended complaint meets the pleading deficiencies asserted by the Defendants in their motion to dismiss. *Pl.'s Mot.* at 1. He argues that he had an objectively reasonable basis for believing the sales were illegal because he knew that the Defendants were being investigated by the United Kingdom Ministry of Defence and the NCIS for potential violations of the Waasenaar Arrangement, export laws in both the United States and the United Kingdom, and military procurement laws in the United States. *Id.* at 1-2. He claims that the reasonableness of his belief is further supported by the fact that he had been informed by James Pollock of the United States Navy that if the Defendants were selling the same diver detection equipment to China that it had already sold to the United States Navy, such conduct would be illegal. *Id.* at 2. Mr. Levitt argues that the Defendants' denial that the systems were functionally identical supports the reasonableness of his belief that the conduct was illegal. *Id.* He asserts that the engineer's field report he obtained established that the systems were identical, and that, when the Defendants became aware that Mr. Levitt had obtained this report, they "knew that their illegal conduct had been discovered and promptly took steps to terminate Plaintiff's employment." *Id.* at 3.

Mr. Levitt asserts that the amendment would not be futile and establishes a reasonable basis both for believing that the sales practice was illegal and for believing it was potentially unsafe to the military personnel of the United States Navy. *Id.* He contends that *Currie v. Industrial Security, Inc.*, 2007 ME 12, 915

A.2d 400, is "the most instructive case," and draws analogies between *Currie* and his own case. *Id.* at 3-5. In particular, he notes that "[h]ere, as in *Currie*, there was evasiveness on the part of the individuals potentially engaged in illegal conduct." *Id.* at 4. He notes that in both cases the employer took steps that indicated they were involved in illegal conduct. *Id.* at 4-5. Finally, he observes that in *Currie*, the plaintiff's belief that his employer was violating the law was based on information from a border patrol agent, whereas here, Mr. Levitt's belief was based in part on information given to him by Jim Pollock. *Id.* at 5.

Emphasizing these three similarities, Mr. Levitt contends that his is a "far stronger case" than *Currie*, and points out that *Currie* was decided on a motion for summary judgment rather than a motion to dismiss. *Id.* at 5-6. He asserts that the amendment is therefore not futile and the amended complaint "clearly meets" the federal pleading standard. *Id.* at 6.

### E.     The Defendants' Opposition

The Defendants argue that the motion to amend should be denied as futile because it does not identify "any actual provision of U.S. or Maine law" that Mr. Levitt reasonably believed was violated, and relies instead on "vague allegations about export law, international law, and military procurement law." *Def.'s Opp'n* at 1. The Defendants contend that the alleged facts added in the proposed amended complaint are insufficient because "none of those facts establish the plausibility that he had an objectively reasonably belief that Defendants were engaging in conduct in violation of U.S. law." *Id.* Although they concede that a plaintiff need not prove

11

that the defendant's conduct actually violated a law, they maintain that "a belief that is contrary to established law is, as a matter of law, not reasonable." *Id.* at 4 (citing *Tripp v. Cole*, 425 F.3d 5, 9-10 (1st Cir. 2005)). They urge that "[w]hen a court cannot find anything in relevant statutory text suggesting the complained of practice is unlawful, plaintiff's belief cannot be reasonable." *Id.* at 4 (citing *Weeks v. Harden Mfg. Corp.*, 291 F.3d 1307, 1317 (11th Cir. 2002)).

The Defendants stress how vague the new allegations are, emphasizing that Mr. Levitt has failed to identify any specific export or procurement laws that he believed were violated. *Id.* Regarding the Wassenaar Arrangement, the Defendants point out that Mr. Levitt has neither identified how it was allegedly being violated nor cited any provision or principle concerning it. *Id.* at 4-5. The Defendants claim that the Wassenaar Arrangement "does not itself impose restrictions on exports," and argue that, in any event, the MWPA's protections do not extend to reports of violations of international law. *Id.* at 5.

The Defendants turn to *Currie*, arguing that it is "not on all fours with the present case because, in part, it concerns whether the plaintiff's belief about the *facts* was reasonable and not whether plaintiff's belief about the applicability of *laws* was reasonable." *Id.* (emphasis in original). In the Defendants' view, the statement of the Border Patrol Agent in *Currie* "had to do with the facts of whether the visitors had obtained work authorizations; it did not have to do with any sort of legal conclusion about which immigration laws were applicable to those visitors." *Id.* In this case, the Defendants argue that the alleged statement by Mr. Pollock

12

"does not establish reasonable belief of a violation of U.S. law . . . because he has not alleged . . . that Pollock stated that he actually believed such a violation had in fact occurred"; rather, Mr. Levitt alleges that Mr. Pollock stated only that it would be unlawful "if Sonardyne International were to sell U.S. Navy technology to its China customer." *Id.* at 6.

The Defendants similarly argue that "the vague and general allegations that the U.S. Navy was 'investigating' Sonardyne International's sale to its China customer also does not establish the plausibility that Plaintiff's alleged belief that the sale was illegal was objectively reasonable." *Id.* The Defendants posit other possible reasons for such an investigation, given "the inescapable fact that U.S. export control laws did not apply to the sale of a product from a company in the United Kingdom to China." *Id.*

The Defendants seek to further distinguish *Currie* on the basis that, unlike *Currie*, in this case there is no smoking gun. The Defendants point out that the allegedly unauthorized individuals in *Currie* fled the scene rather than answer questions about their immigration status. *Id.* at 7. The Defendants maintain that their assurances to Mr. Levitt that no law had been violated are not evidence of "evasiveness" and do not support Mr. Levitt's contentions. *Id.*

The Defendants dismiss Mr. Levitt's asserted concern over the safety of American sailors as an "afterthought" that is also not objectively reasonable. *Id.* at 8. They argue that Mr. Levitt's worry involves only a "remote possibility" based on a "highly speculative and unlikely scenario." *Id.* Given the current peaceful state of

13

affairs between the United States and China, the Defendants characterize Mr. Levitt's concerns about the sale of sonar equipment as not objectively reasonable. *Id.* The Defendants maintain that the MWPA requires more certainty regarding the risk to an individual's health or safety than Mr. Levitt can show. *Id.* According to the Defendants, the MWPA does not protect employees who express "improbable concerns about remote possibilities of risk." *Id.*

The Defendants argue, in addition, that Mr. Levitt's alleged communications with Mr. Pollock at the U.S. Navy are not protected conduct under the MWPA, because "Mr. Pollock is not a member of law enforcement and the U.S. Navy is not a 'public body' as defined by the MWPA." *Id.* at 9. The Defendants observe that Mr. Levitt has not alleged any direct contact with NCIS and maintain that "his claim for relief under the MWPA should be limited to allegations of retaliation for reports he made to Defendants." *Id.* at 10.

In sum, the Defendants contend that Mr. Levitt's assertions are vague and implausible, and that his failure to identify any specific statutory provision "dooms his claim." *Id.*

## F.    Eric Stephen Levitt's Reply

Mr. Levitt begins his reply by noting that he has been careful not to submit "after-acquired evidence of what he or his attorneys have later determined to be the law" as support for the reasonableness of his belief that the Defendants' sales practices were illegal and unsafe, which he acknowledges must be assessed "from the time he blew the whistle until the time he was fired." *Pl.'s Reply* at 1.  Mr.

14

Levitt responds to the Defendants' argument that he must point to a specific statutory violation by citing *Halkett v. Correctional Medical Services, Inc.*, 763 F. Supp. 2d 205 (D. Me. 2011), which Mr. Levitt claims shows both "that the complained-of conduct need not actually be illegal" and that an MWPA plaintiff need not point to a specific statutory violation. *Pl.'s Reply* at 1-2. He also claims support from *Bodman v. Maine Department of Health and Human Services*, 720 F. Supp. 2d 115 (D. Me. 2010). *Pl.'s Reply* at 2.

Mr. Levitt distinguishes *Tripp v. Cole*, *supra*, as having been resolved at the summary judgment stage and as a case involving "extreme overreach" by the plaintiff. *Pl.'s Reply* at 2-3. Mr. Levitt disputes the Defendants' contention that the MWPA does not extend to his communications with Mr. Pollock, maintaining that his lack of direct contact with NCIS is immaterial. *Id.* at 3-4. Mr. Levitt contends that although Mr. Pollock's statement was conditional, Mr. Levitt separately knew that the systems were identical and thus that the Defendants were engaged in an illegal and unsafe business practice. *Id.* at 4. In response to the Defendants' argument that the safety risks of the alleged practice are remote, Mr. Levitt contends that he need not quantify the risk or show it is imminent. *Id.* at 4-5 (citing *Walsh v. Town of Millinocket*, 2011 ME 99, 28 A.3d 610). He claims that "[i]t is not for the Court or the jury to quantify what the risk is of a potential military engagement between the United States and [China]," and argues that the risk here is "a more defined risk than the complaint that survived summary judgment, albeit on appeal," in *Stewart-Dore*. *Pl.'s Reply* at 5-6.

15

### III.    DISCUSSION

#### A.    Applicable Law

As an initial matter, the parties disputed in their first round of briefs whether the Maine Rules of Civil Procedure or the Federal Rules of Civil Procedure apply.  If Mr. Levitt maintains that the Maine Rules govern, he is wrong.  Federal Rule of Civil Procedure 81(c)(1) provides that "[t]hese rules apply to a civil action after it is removed from a state court."  FED. R. CIV. P. 81(c)(1).

#### B.    Proposed Amendments and Futility

Mr. Levitt seeks leave to amend pursuant to Federal Rule of Civil Procedure 15(a)(2), which instructs the Court to "freely give leave when justice so requires." *Pl.'s Mot.* at 1; FED. R. CIV. P. 15(a)(2).  If the proposed amendment would be futile, however—in other words, if the proposed amended complaint would fail to state a claim upon which relief could be granted—the Court may deny the motion to amend.  *Edlow v. RBW, LLC*, 688 F.3d 26, 39-40 (1st Cir. 2012); *Glassman v. Computervision Corp.*, 90 F.3d 617, 623 (1st Cir. 1996) ("'Futility' means that the complaint, as amended, would fail to state a claim upon which relief could be granted").  Whether Mr. Levitt's proposed amendment would be futile mirrors the analysis of a motion to dismiss under Rule 12(b)(6).  *See id.* at 40 ("our review . . . is, for practical purposes, identical to review of a Rule 12(b)(6) dismissal based on the allegations in the amended complaint") (quoting *Platten v. HG Bermuda Exempted Ltd.*, 437 F.3d 118, 132 (1st Cir. 2006)).

#### C.    The Federal Pleading Standard

16

Under Federal Rule of Civil Procedure 8(a), "a pleading that states a claim for relief must contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2). "To survive a motion to dismiss, a complaint must set forth factual allegations, either direct or inferential, respecting each material element necessary to sustain recovery under some actionable legal theory." *Anderson v. Hannaford Bros. Co.*, 659 F.3d 151, 157 (1st Cir. 2011). The Supreme Court has observed that "the pleading standard Rule 8 announces does not require detailed factual allegations, but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).

In ruling on a motion to dismiss, the Court is required to accept as true the plaintiff's well-pleaded factual allegations and to draw all reasonable inferences in favor of the plaintiff. *San Gerónimo Caribe Project, Inc. v. Acevedo-Vilá*, 687 F.3d 465, 471 (1st Cir. 2012) (en banc) (internal citations omitted). However, the Court is "not bound to accept as true a legal conclusion couched as a factual allegation," *id.* (quoting *Iqbal*, 556 U.S. at 678), nor is it bound to credit "bald assertions, periphrastic circumlocutions, unsubstantiated conclusions, [ ] outright vituperation, . . . subjective characterizations, optimistic predictions, or problematic suppositions." *Gagliardi v. Sullivan*, 513 F.3d 301, 305 (1st Cir. 2008). The Court "may augment the facts in the complaint by reference to documents annexed to the

complaint or fairly incorporated into it and matters susceptible to judicial notice." *Id.* at 306 (internal punctuation omitted).

The First Circuit recently described the proper analytic path as a two-step exercise:

> Step one: isolate and ignore statements in the complaint that simply offer legal labels and conclusions or merely rehash cause-of-action elements. Step two: take the complaint's well-pled (i.e., non-conclusory, non-speculative) facts as true, drawing all reasonable inferences in the pleader's favor, and see if they plausibly narrate a claim for relief.

*Schatz v. Republican State Leadership Committee*, 669 F.3d 50, 55 (1st Cir. 2012) (citing *Ocasio-Hernandez v. Fortuño-Burset*, 640 F.3d 1, 12 (1st Cir. 2011)). Determining whether a claim is "plausible" is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679; *see also Schatz*, 669 F.3d at 55.

### D.     The Maine Whistleblowers' Protection Act

The MWPA prohibits an employer from discharging an employee for the reason that "[t]he employee, in good faith, or a person acting on behalf of the employee, reports orally or in writing to the employer or a public body what the employee has reasonable cause to believe is a violation of a law or rule adopted under the laws of [Maine], a political subdivision of [Maine] or the United States." 26 M.R.S. § 833(1)(A).[1]  It similarly prohibits an employer from discharging an employee for reporting "what the employee has reasonable cause to believe is a

---

[1]     Technically the cause of action arises under the Maine Human Rights Act (MHRA).  *See* 5 M.R.S. §§ 4572(1)(A), 4621.  The MHRA "provides a right of action to . . . whistleblowers who have suffered retaliatory discharge." *Costain v. Sunbury Primary Care, P.A.*, 2008 ME 142, ¶ 6, 954 A.2d 1051, 1053.

condition or practice that would put at risk the health or safety of that employee or any other individual." *Id.* § 833(1)(B).  Whether the employee has reported legal or health or safety violations, the MWPA requires that the employee's belief that a violation is occurring be both objectively reasonable and in good faith.  *See Stewart-Dore*, 2011 ME 26, ¶ 11, 13 A.3d at 776; *Tripp*, 425 F.3d at 9; *Bard v. Bath Iron Works Corp.*, 590 A.2d 152, 154-55 (Me. 1991).

"There are three elements to a claim of unlawful retaliation [under the MWPA]: (1) the employee engaged in activity protected by the statute; (2) the employee was the subject of an adverse employment action; and (3) there was a causal link between the protected activity and the adverse employment action." *Costain*, 2008 ME 142, ¶ 6, 954 A.2d at 1053.  Here, only the first element—whether Mr. Levitt has alleged that he engaged in protected activity—is in dispute.

### E.   The Objective Reasonableness of Mr. Levitt's Beliefs

#### 1.   Illegality

In their motion to dismiss, the Defendants' sole contention is that Mr. Levitt failed to allege specific facts showing that he had an objectively reasonable belief that the Defendants violated either Maine or United States law.  *Defs.' Mot.* at 1. They maintain that Mr. Levitt's proposed amended complaint suffers from the same defect, and should accordingly be denied as futile.  *Defs.' Opp'n* at 1.

It bears emphasis that at this stage the Court is not called upon to decide whether Mr. Levitt has persuasively established that his belief was objectively reasonable; the Court's role in a motion to dismiss is to determine only whether Mr.

19

Levitt has surmounted the much lower bar of "plausibly narrat[ing] a claim for relief." *Schatz*, 669 F.3d at 55.  In assessing Mr. Levitt's allegations, the Court need not defer to the conclusory assertions in Mr. Levitt's Complaint that his belief was objectively reasonable.  *See Acevedo-Vilá*, 687 F.3d at 471 (the Court is "not bound to accept as true a legal conclusion couched as a factual allegation").  But the Court must accept as true Mr. Levitt's well-pleaded factual allegations and must draw all reasonable inferences in his favor.  *Id.*

Mr. Levitt's initial Complaint included little more than conclusory assertions and a vague reference to "the nature of the product being sold," but his First Amended Complaint provides more detailed grounds for his belief that the Defendants were violating "export laws, the Wassenaar Arrangement, and military procurement laws in the United States." *First Am. Compl.* ¶ 31.  In particular, Mr. Levitt alleges that "an employee of the United States Navy, James Pollock, who was directly cooperating with the NCIS" told him that "if Defendants were selling the identical diver detection system to the military of [China], this sales practice would be both illegal and unsafe to American naval personnel." *Id.* ¶¶ 26, 32.  Mr. Levitt also alleges that, during his employment, he "became aware that Defendants were selling diver detection technology for military use to [China] that was virtually identical to the diver detection technology that had already been sold to the United States Navy." *Id.* ¶ 16.  Accepting these allegations as true and drawing all reasonable inferences in Mr. Levitt's favor, the Court concludes that the allegations

20

in the proposed amended complaint narrate a plausible claim that his belief that the Defendants were violating U.S. law was objectively reasonable.

The Defendants take the position that unless Mr. Levitt can point to a specific statutory provision he believed was violated, his claim cannot go forward. Although more precision would make this an easier case, identifying a specific statutory provision is not an absolute requirement under the MWPA, which requires only that Mr. Levitt satisfy the more general standard of reasonableness. The MWPA does not restrict the ways in which a plaintiff may show that his belief is reasonable. Mr. Levitt proposes that Mr. Pollock's statements of illegality satisfy the requirement that Mr. Levitt's belief was reasonable because—drawing a reasonable inference in Mr. Levitt's favor—Mr. Pollock is a person knowledgeable about the law.

Mr. Levitt rightfully points to *Currie* as analogous to his case in this regard. In *Currie*, the plaintiff suspected that two Canadian employees were not authorized to work in the United States. *Id.*, 2007 ME 12, ¶ 3, 915 A.2d at 402. A Border Patrol Agent confirmed his suspicion. *Id.* The Law Court did not require the plaintiff in *Currie* to identify the specific statutory provision he believed was being violated, holding that allegations that management evaded the plaintiff's questions, that the Canadian employees left the mill after the plaintiff threatened to call a supervisor, and that the Border Patrol Agent confirmed the plaintiff's belief, were sufficient for the plaintiff's claim to survive summary judgment. *Id.*, 2007 ME 12, ¶ 16, 915 A.2d at 405. Although immigration laws are more a matter of common

knowledge than those respecting foreign sales of diver detection technology—and the *Currie* plaintiff's belief was thus more obviously reasonable than Mr. Levitt's—the reasonableness of Mr. Levitt's belief requires factual resolution and the Court must leave the ultimate determination of whether his belief was reasonable to the finder of fact.[2]

The Defendants attempt to distinguish *Currie* by drawing a line between beliefs about facts and beliefs about the applicability of laws. *Defs.' Opp'n* at 5-6. Defendants see a significant difference in the fact that the Border Patrol Agent's representations in *Currie* concerned "facts," whereas here Mr. Pollock's representations concerned laws. This distinction is tenuous and does not withstand scrutiny. For one thing, the "facts" in *Currie*—that the Canadian workers were unauthorized—are better characterized as legal conclusions grounded on both factual and legal predicates. More importantly, however, the distinction is simply not relevant to whether the employee's belief is objectively reasonable. A belief that conduct is illegal necessarily incorporates predicate beliefs regarding both facts and laws. The source of an employee's beliefs is relevant only insofar as it makes those beliefs more or less reasonable. In *Currie*, the Border Patrol Agent provided the employee with information regarding background legal facts; in this case, Mr. Pollock claimed to know the law but not the facts. This distinction carries no legal significance.

---

[2]     In *Currie*, the plaintiff also alleged that he was fired for internally reporting the dumping of paint thinner. *Currie*, 2007 ME 12, ¶¶ 25-29, 915 A.2d at 406-08. Though the parties do not discuss this aspect of *Currie*, the Law Court allowed this claim to proceed as well without any discussion of the particular legal provisions implicated by the plaintiff's report. *See id.*

Next, the Defendants argue that Mr. Pollock's statement that selling identical technology to the Chinese would be illegal does not establish the reasonableness of Mr. Levitt's belief because Mr. Levitt has not alleged that Mr. Pollock stated "that he actually believed such a violation had in fact occurred." *Defs.' Opp'n* at 6. If Mr. Pollock's statement were the sole basis for Mr. Levitt's belief that the Defendants were violating the law, the Defendants would have a better argument. However, this argument disregards the other well-pleaded allegations in Mr. Levitt's Complaint, which the Court must accept as true. In particular, Mr. Levitt also alleges that he knew that the Defendants were in fact selling "virtually identical" technology to China—which is what Mr. Pollock told him would be illegal. His allegations therefore support the conclusion that he had a reasonable basis to believe the Defendants were violating the law. Moreover, resolving all reasonable inferences in Mr. Levitt's favor, his additional allegations regarding investigations by the United Kingdom Ministry of Defence and the NCIS, though vague, tend to support his contentions, as does the fact that he was terminated after obtaining and confronting his supervisors with what he alleges is damning information. Of course, as the Defendants argue, there are other possible interpretations of these facts. But again, at this stage the Court must view Mr. Levitt's allegations in the light most favorable to his claims.

Finally, the Defendants contend that Mr. Levitt's legal conclusion that they were violating the law is "demonstrably false and counter to established law." *Defs.' Opp'n* at 5; *Defs.' Mot.* at 5-6. For support, they cite *Tripp*, *supra*. In *Tripp*, the

First Circuit held that for an MWPA plaintiff to proceed, "the complained-of conduct need not *actually* be illegal, but the employee must prove that a reasonable person might have believed that it was." *Tripp*, 425 F.3d at 9 (emphasis in original). The plaintiff in *Tripp* was a police chief who was fired for complaining about the illegality of a city manager's request that a prosecutor drop a case. *Id.* at 7-8. The First Circuit affirmed summary judgment for the defendant on the MWPA claim because it agreed with the district court that the police chief's belief that the request was illegal was not reasonable as a matter of law. *Id.* at 9-10. The police chief's belief, however, was apparently grounded on nothing more than his own broad interpretation of a statutory provision—an interpretation that flew in the face of the much narrower reading consistently applied by Maine courts. *Id.* Here, by contrast, Mr. Levitt's belief that the Defendants' sales to China were illegal was supported by Mr. Pollock's statements as well as the attendant circumstances, including Mr. Levitt's knowledge of an ongoing investigation by NCIS. Under *Tripp*, the accuracy of Mr. Levitt's belief is immaterial so long as it was objectively reasonable, and on this question, the Court concludes that Mr. Levitt's allegations are sufficient.

### 2.   Safety

Mr. Levitt's proposed amended complaint adds that his whistleblowing was based on his belief that the Defendants' sales practices were unsafe, in addition to being illegal, in that they put at risk the lives of American sailors. *First Am. Compl.* ¶ 17. The Defendants argue that, given the peaceful state of affairs between

China and the United States, this risk was too remote for Mr. Levitt's belief to be objectively reasonable. *Defs.' Opp'n* at 8-9 ("[The MWPA] does not protect employees who express improbable concerns about remote possibilities of risk"). Citing no caselaw, the Defendants assert that "[t]he MWPA does not protect employees who have concerns that an employer's policy or practice *might* put at risk an individual's health or safety . . . [r]ather, it protects employees who report about a condition or practice that *actually would* put at risk an individual's health or safety." *Id.* at 8 (emphasis in original). In reply, Mr. Levitt denies that the quantum of risk matters for purposes of the MWPA, citing *Walsh v. Town of Millinocket*, 2011 ME 99, 28 A.3d 610, and *Stewart-Dore*, *supra*. At the same time, he emphasizes the possibility of an armed engagement with China, and observes that "[k]nowledge by a potential military rival of the defense system installed on U.S. Navy vessels wholly vitiates the protective measures the U.S. Navy has taken to diminish the risk to the lives of its naval personnel." *Pl.'s Reply* at 5.

The plain language of the statute dispatches one of the Defendants' arguments. 26 M.R.S. § 833(1)(B) protects employees that report "what the employee has reasonable cause to believe is a condition or practice that would put at risk the health or safety of that employee or any other individual." It follows that the Defendants' assertion that 26 M.R.S. § 833(1)(B) protects only employees who report about a condition or practice that "actually would" put at risk an individual's health or safety misstates the law. Just as 26 M.R.S. § 833(1)(A) requires only a

reasonable belief that a law was being violated—not an actual violation—26 M.R.S.

§ 833(1)(B) requires only a reasonable belief that a condition or practice was unsafe.

However, the statute is silent on how imminent the perceived risk must be to

qualify for protection, and the Law Court has added little gloss to the text.  The Law

Court noted in *Stewart-Dore*:

> [t]he [MWPA] does not protect every complaint that relates to safety.
> Rather it protects only complaints made in good faith, and only reports
> made with reasonable cause to believe a dangerous condition or
> practice exists. . . . The reasonable cause requirement is met only when
> the employee presents evidence showing that she had a subjective
> belief that a dangerous condition or practice existed, and that the
> belief was objectively reasonable in that a reasonable person might
> have believed that a dangerous condition existed.

*Id.*, 2011 ME 26, ¶ 11, 13 A.3d at 776.  Here, the Defendants do not dispute that Mr.

Levitt's complaints were made in good faith.  They dispute only whether their

alleged sales of diver detection equipment to China can qualify as an unsafe

practice.

The reported cases involving safety complaints under the MWPA encompass

a variety of risks, some more and some less imminent; none involves military

affairs.  *See Walsh*, 2011 ME 99, ¶ 3, 28 A.3d at 612 (unsafe conditions on

snowmobile trails); *Stewart-Dore*, 2011 ME 26, ¶ 10, 13 A.3d at 775 (nurse with

staph infection and poor working relationship between two nurses endangering

patient safety); *Blake v. State of Maine*, 2005 ME 32, 868 A.2d 234 (mistreatment of

clients at Maine Department of Behavioral and Development Services); *Ginn v.

Kelley Pontiac-Mazda, Inc.*, 2004 ME 1, ¶ 2, 841 A.2d 785, 786 (selling used cars

without first inspecting them); *DiCentes v. Michaud*, 1998 ME 227, ¶ 15, 719 A.2d

509, 514 (ventilation problems in a high school's chemistry lab); *Pooler v. Maine Coal Products*, 532 A.2d 1026 (Me. 1987) (faulty brakes and tires on company truck); *Faragi-Snow v. PFRF, Inc.*, No. CV-11-26, 2012 Me. Super. LEXIS 66, at *1-2 (Me. Super. Ct., York Co., Apr. 11, 2012) (employee's concern that co-worker was a registered sex offender); *Theriault v. Hi Tech Insulation Services*, Docket No. CV-10-049, 2011 Me. Super. LEXIS 10, at *1 (Me. Super. Ct., Androscoggin Co., Jan. 5, 2011) (faulty brakes on company truck); *Duggan v. Saddleback*, Civil Action Docket No. CV-06-219, 2008 Me. Super. LEXIS 198 (Me. Super. Ct., Androscoggin Co., Oct. 31, 2008) (unsafe electrical work at ski resort); *Grose v. Industrial Union of Marine & Shipbuilding Workers of America, Local S6*, Civil Action Docket No. CV-94-050, 1996 Me. Super. LEXIS 306 (Me. Super. Ct., Sagadahoc Co., Sept. 13, 1996) (union hall in disrepair); *Gammon v. Crisis & Counseling Ctrs., Inc.*, 762 F. Supp. 2d 165, 184-85 (D. Me. 2011) (safety protocols at mental health services company not followed, specific client safety concerns ignored, and workers required to drive in dangerous weather conditions); *Brown v. Town of S. Thomaston*, Civil No. 08-308-P-H, 2009 U.S. Dist. LEXIS, at *62-63 (D. Me. June 29, 2009) (health and safety risks posed by placing someone with standing and lifting restrictions in a fire police officer job); *Eaton v. Kindred Nursing Centers West, LLC*, Civil No. 04-131-B-W, 2005 U.S. Dist. LEXIS 9545 (D. Me. May 19, 2005) (patient abuse); *Higgins v. New Balance Athletic Shoe, Inc.*, 21 F. Supp. 2d 66 (D. Me. 1998) (verbal and physical abuse by co-workers).

27

The statute speaks in broad terms, covering any "condition or practice that would put at risk the health or safety of [the plaintiff] or any other individual." 26 M.R.S. § 833(1)(B). The Maine Legislature could have qualified "risk" with an adjective such as "imminent" or "substantial" but did not. Nor have Maine courts endorsed the narrow construction urged by the Defendants. Mr. Levitt's claim fits within the plain language of the statute, and this Court will not interpolate qualifications into that text. To the extent the Defendants argue that Mr. Levitt's concern was not objectively reasonable given the remoteness of the perceived risk, that is a question for the finder of fact to resolve at a later stage.

### 3.      External Reports as Protected Activity

The Defendants contend that Mr. Levitt's communications with Mr. Pollock do not qualify as "protected activity" under the MHRA and MWPA—because "Mr. Pollock is not a member of law enforcement and the U.S. Navy is not a 'public body' as defined by the MWPA"—and ask the Court to limit his claim for relief to "allegations of retaliation for reports he made to Defendants." *Defs.' Opp'n* at 9-10. Mr. Levitt responds that "Defendants cannot credibly claim that an entity called the Naval Criminal Investigation Service is not a 'law enforcement agency' as defined at 26 M.R.S.A. § 832(4)(E)." *Pl.'s Reply* at 3-4.

Although the NCIS may be a law enforcement agency, Mr. Levitt's argument misses the point. Referring to section 832(4), the *Bard* Court plainly observed that "the term 'public body' as used in the statute does not encompass federal agencies." *Bard*, 590 A.2d at 156. Section 832(4) defines "public body" in six subsections,

28

including a "law enforcement agency or any member or employee of a law enforcement agency" under subsection (E).  Under *Bard*, a complaint to a federal law enforcement agency like NCIS is not a report to a public body under the MWPA.

Nevertheless, this conclusion does not affect the Court's ruling on the motion for leave to amend or the motion to dismiss.  Even if the allegations regarding Mr. Levitt's external complaints were eliminated, the Amended Complaint alleges internal complaints as well and therefore withstands dismissal.  The Defendants' motion to dismiss and their opposition to the motion for leave to amend are not the proper vehicles to parse specific factual allegations in the Amended Complaint.

## IV.  CONCLUSION

The Court DISMISSES as moot Sonardyne, Inc., and Sonardyne International, Ltd.,'s Defendants' Motion to Dismiss (ECF No. 22) and GRANTS Eric Stephen Levitt's Motion for Leave to Amend His Complaint (ECF No. 32).

SO ORDERED.


/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
CHIEF UNITED STATES DISTRICT JUDGE

Dated this 15th day of January, 2013

29